FILED
CLERK, U.S. DISTRICT COURT

FEB I 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TOM KAGY,                          )        CASE NO. CV 05-08819 VBF (RZ)
                                   )
                Plaintiff,         )
                                   )        ORDER ACCEPTING FINDINGS
        vs.                        )        AND RECOMMENDATIONS OF
                                   )        UNITED STATES MAGISTRATE
RICHARD BARNES, ET AL.,            )        JUDGE
                                   )
                Defendants.        )
_____)

        The Court has reviewed the file in this matter, and has read and reviewed the
Report and Recommendation of United States Magistrate Judge and has reviewed
de novo any matters as to which objections have been filed.  The Court accepts the
findings and adopts it as its Statement of Uncontroverted Facts and Conclusions of Law.

DATED:      2-8-08


                                    _____
                                    VALERIE BAKER FAIRBANK
                                    UNITED STATES DISTRICT JUDGE

FILED
CLERK, U.S. DISTRICT COURT

SEP - 4 2007

CENTRAL DISTRICT OF CALIFORNIA
BY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

TOM KAGY,

      Plaintiff,

   vs.

RICHARD BARNES, ET AL.,

      Defendants.

CASE NO. CV 05-08819 VBF (RZ)

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

   Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Report and Recommendation to the Honorable Valerie Baker Fairbank, United States District Judge. Defendants, in several groups, have moved for summary judgment or summary adjudication. As discussed below, the undersigned recommends that the Court grant Defendants' motions in part and dismiss the action (1) with prejudice as to its federal claims but (2) without prejudice as to its state-law claims.

///

///

///

///

///

DOCKETED ON CM

SEP - 4 2007

BY _____ 049

# I.

# INTRODUCTION

## A.   Summary Of Factual Contentions

The plaintiff in this civil rights action challenges, among other alleged things, his involuntary psychiatric detention on January 21, 2005.  On that date, Ventura County Sheriff's Department (VCSD) Deputy Robert Barnes, acting on information from an FBI agent, from County reports and from his own observations, took the *pro se* plaintiff Tom Kagy into involuntary psychiatric custody, where he remained for six days.  Plaintiff alleges that Barnes and the other defendants violated his rights under federal and state law by detaining him, confiscating his pistol and disseminating falsehoods and private information about him.

As discussed further below, prior to his detention, Plaintiff had complained repeatedly to VCSD officials about alleged harassment by neighbors and others at and around his Ventura County homes, first in Camarillo where he lived adjacent to a golf course, and thereafter in Moorpark.  (While at Camarillo, he also directed numerous complaints to management at the golf course.)  The officials typically found Plaintiff's harassment claims – which included assertions that unknown persons, possibly nearby residents, were regularly shooting powerful microwave beams at his home – to be bizarre and unsubstantiated.  Frustrated with local officials' reaction, Plaintiff contacted the FBI.

During an interview with FBI Special Agent Linda Dozer in January 2005, Plaintiff mentioned buying and using a shotgun to defend his home from microwave attackers (although the exact words and context of that statement are disputed).  Dozer gave her account of Plaintiff's comments to County officials, who had developed a substantial dossier on Plaintiff during the prior few years.  Based on Dozer's report, on other records of Plaintiff's recent conduct (including his repeated complaints about microwave "zappings" by unknown assailants) and on personal observations at Plaintiff's home, Deputy Barnes took Plaintiff into custody later that day pursuant to CAL. WELF. &

1 | INST. CODE § 5150 ("section 5150"), confiscated Plaintiff's pistol, and transported him to

2 | a mental hospital, where Dr. Rocio Agusto admitted him based on similar information.

3 |      That June, Plaintiff sought the return of his gun in state court. After a hearing

4 | during which Dr. Charles Thomas testified in opposition, the court denied relief.

6 | **B.**    **Defendants**

7 |      Tom Kagy is the sole plaintiff. He sues several defendants, who have filed

8 | several pending summary judgment motions in the following groupings:

9 |     1.   The **Federal Defendants**, namely FBI Special Agent **Linda Dozer**

10 |        and the United States of America, sued as the **FBI**.

11 |     2.   **County of Ventura** ("Ventura County" or simply "the County").

12 |     3.   **County Sheriff's Deputy Robert Barnes**, the person who took

13 |        Plaintiff physically into custody.

14 |     4.   **Charles Thomas, M.D.,** a psychiatrist who was the acting medical

15 |        director of the facility at which Plaintiff was detained and who testified

16 |        at a June 2005 hearing about Plaintiff's right to get his gun back.

17 |      The undersigned at times refers to the County, Barnes and Thomas collectively

18 | as the "County Defendants."

19 |      Plaintiff also purports to sue twenty "Doe" defendants – ten more than

20 | permitted by CIV. L.R. 19-1 – but he has neither served nor supplied the name of any of

21 | them, even after the close of discovery. Accordingly, the undersigned omits discussion of

22 | the Does from the following summary of Plaintiff's claims and recommends that the Court

23 | dismiss them from the action.

25 | **C.**    **Claims**

26 |      Plaintiff enumerates the following claims, all but the first and seventh of which

27 | invoke state tort law rather than federal substantive law. Plaintiff sues all named Defendants

28 | on the first six claims and seeks a declaratory judgment on the seventh.

| Claim # | Basis and Targeted Defendants |
|---------|-------------------------------|
| 1 | Unreasonable seizure (42 U.S.C. § 1983) of Plaintiff and his firearm, in violation of his Fourth, Fifth and Second Amendment rights. |
| 2 | False arrest. |
| 3 | False imprisonment. |
| 4 | Libel. |
| 5 | Slander. |
| 6 | False light invasion of privacy. |
| 7 | CAL. WELF. & INST. CODE § 5150 is unconstitutional. |

In addition to the declaratory relief sought on claim 7, Plaintiff seeks over a million dollars in damages and other relief. *See* First Am. Comp. at 11-12 (prayer).

**D.     Federal Defendants' Arguments**

The Federal Defendants present the following arguments for summary adjudication:

1.   *No seizure by these Defendants*:   No reasonable fact-finder could conclude that Federal Defendants violated 42 U.S.C. § 1983, because they simply did not "seize" Plaintiff or his gun; rather, those actions and decisions were undertaken solely by others, namely County officials.

2.   *Immunity for communication to law enforcement:*   the Federal Defendants enjoy absolute immunity from (state) tort liability under CAL. CIV. CODE § 47(b) and cases construing that law, because their actions were limited to communication with law enforcement officers.

**E.     County Defendants' Arguments**

Although the details of the three separate motions by the County Defendants vary, their motions overlap substantially and have the following arguments in common:

1.   CAL. WELF. & INST. CODE § 5150 is not unconstitutional.

2.   *Qualified immunity*:  A reasonable officer, possessing the information that Deputy Barnes and Dr. Thomas possessed at the pertinent times, could have believed that probable cause existed for Plaintiff's involuntary psychiatric detention.

3.   *Dismissal of pendent state-tort claims*:  If the Court dismisses the two federal claims (by agreeing with the above two arguments), it should decline supplemental jurisdiction over the several state-tort claims and dismiss them without prejudice.  (The County Defendants also argue that the state claims should be summarily adjudicated on their merits in Defendants' favor.)

## II.
## STANDARD OF PROOF

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party seeking summary judgment bears the initial responsibility of showing there is no genuine issue for trial, before the nonmoving party must introduce evidence.  But the moving party is not initially required to *introduce evidence* negating an element on which the non-moving party will bear the burden of proof at trial (although the moving party may, and often does, do so).  Rather, the moving party need only point out to the Court that, on at least one such element, no evidence supports the non-moving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir. 1994).

In some of their arguments here, however, the defendants seek summary judgment on an issue as to which *they*, not Plaintiff, would bear the burden of persuasion at trial, namely immunity.  In such cases, their initial showing must be sufficient for the Court to hold that no reasonable trier of fact could find other than for the moving party.

1  *See Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); *see*

2  *generally* 3 WILLIAM A. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE,

3  CALIFORNIA PRACTICE GUIDE:  FEDERAL CIV. PROC. BEFORE TRIAL (2007) ¶¶ 14:124-

4  126.1, 14:140-141.

5          Once the moving party meets its initial burden, the nonmoving party may not

6  rest upon the mere allegations or denials of his pleading but rather must set forth specific

7  facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477

8  U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  This requirement applies not

9  only to summary judgment motions in general, but also to such motions asserting the

10  defense of immunity. *See Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 961-

11  63 (9th Cir. 2004) (expressly repudiating portions of certain other Ninth Circuit cases

12  suggesting that, in deciding defendant's immunity-based summary judgment motion, district

13  court should "assum[e] the truth of the factual allegations contained in plaintiffs' complaint

14  without regard to whether those allegations had evidentiary support in the record") (case

15  involving qualified immunity).  "Where disputed facts exist, however," courts "can

16  determine whether . . . immunity [is] appropriate by assuming that the version of the material

17  facts asserted by the non-moving party is correct," *if* competent evidence supports that

18  version. *See KRL v. Moore*, 384 F.3d 1105, 1110 (9th Cir. 2004) (case involving qualified

19  immunity).

20          Nevertheless, any inferences drawn from the evidence presented will be viewed

21  in a light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 254.  *Pro se*

22  pleadings must be liberally construed, moreover, because the "court recognizes that it has

23  a duty to ensure that *pro se* litigants do not lose their right to a hearing on the merits due to

24  ignorance of technical procedural requirements." *Balistreri v. Pacifica Police Dept.*, 901

25  F.2d 696, 699 (9th Cir. 1990).

26          The Court generally may not weigh direct evidence to determine its credibility;

27  thus, "implausibility" is not a proper basis for rejecting direct evidence at the summary

28

judgment stage.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1207-08 (9th Cir. 1988) (court

deciding Rule 56 motion lacks authority to reject eyewitness testimony as "implausible").

### III.

### UNDISPUTED FACTS[1]

Although the climax of this case perhaps arrives only late in January 2005, it

began much earlier.

Plaintiff and his family resided in Camarillo from 2000 through spring 2004 in

a home adjacent to a golf course, separated from the fairway by a fence.  *See* Pl.'s Decl.

¶ 14. During that time, Plaintiff believed and reported that he was harassed on numerous

occasions and in various ways.  *See* Pl.'s Statement of Genuine Issues (in response to

Barnes Motion) (SGIB) ¶ 2.  These reported acts of harassment included the following.

(Although Defendants dispute at least some of Plaintiff's assertions, for the Court's

purposes, what is "undisputed" is that Plaintiff *complained of* these incidents, typically

thereby generating VCSD records.  In turn, those records, whether accurate or not, later

provided some of the grounds asserted for involuntarily detaining him – for they generally

present Plaintiff in a negative light.)

> \*    golfers' shouting of obscenities from the adjacent course, prompting Plaintiff
>       to confront the golfers verbally and, on at least two occasions, to vault the
>       golf-course fence and then continue the confrontation.  *See* Pl.'s Decl. ¶¶ 15,
>       21-22.
>
> \*    noisy pre-dawn mowing and talking by course employees, prior to what
>       Plaintiff says were the course's stated hours of operation – and often
>       awakening Plaintiff.  *See* Pl.'s Decl. ¶ 17.

---

[1]   Notwithstanding the caption of this section, the undersigned also includes (1) some factual matters that *are* disputed based on competent evidence, in which instances the version of events recited is that of Plaintiff, as the non-moving party, *see KRL v. Moore, supra*, 384 F.3d at 1110; and, much more often, (2) some factual matters asserted by Defendants that Plaintiff purports to dispute but without a sound basis for doing so.

\*   targeting and hitting Plaintiff's house with rocks, racial epithets and golf balls, the latter sometimes inscribed with such epithets. Pl.'s Decl. ¶ 17.

\*   suspected break-ins at Plaintiff's home, relating, he further suspected, to surveillance devices placed there by his unknown harassers. *See* Pl.'s Decl. ¶¶ 24-26.

\*   Plaintiff's discovering a small black box attached to the wiring under his 2003 Envoy's dashboard – a box that a VCSD deputy believed to be a benign device used by auto mechanics in service diagnostics, but which Plaintiff believed might have a sinister purpose. *See* Pl.'s Decl. ¶ 30.

But Plaintiff's most extraordinary harassment complaint was about the deliberate firing of aimed electromagnetic pulses (EMPs) at his home using microwave energy. *See* Pl.'s Decl. ¶¶ 24-27. Plaintiff's suspicion that the EMPs were causing computer, phone and health problems for him and his wife prompted Plaintiff to attach metal linings to the interior walls of the house in an effort to minimize the suspected EMP intrusions. Pl.'s Decl. ¶ 27. In his search for his EMP persecutors, Plaintiff began staying up parts of the night at times, on occasion trespassing onto the golf course, using a powerful flashlight. SGIB ¶ 6. Plaintiff never actually saw any persons aiming any devices at his home, but he did sometimes observe shadowy figures roaming nearby in the wee hours. *See* Barnes Ex. A (Pl.'s Depo.) at A23-24 (Camarillo).

Another occurrence reported by Plaintiff involved a party at the golf course's clubhouse on February 27, 2004 at which Plaintiff suspects some nearby residents mocked his sexual attributes. (Nine days earlier, a state court had heard arguments about extending a temporary restraining order against Plaintiff, obtained *ex parte* by one of Plaintiff's neighbors. In the court hallway, one woman, unknown to Plaintiff, referred to him as "Grunky" and said "Grunky doesn't have much down there," referring to his crotch. Pl.'s Decl. ¶ 40. After the hearing, attended by Plaintiff and several other nearby residents, the court denied any further restraining order. *Id.*) At about 11 p.m., Plaintiff claims to have heard "catchy, raplike . . . lyrics" from the clubhouse 200 yards away, "about a man named

'Grunky' or 'Crunky' who, due to his poor sexual endowment, sat alone while his wife went out cavorting with other men." Pl.'s Decl. ¶ 42.  Unable to record this performance before it ended, Plaintiff drove to the clubhouse but was intercepted by a club employee and told to leave.  As Plaintiff returned to his car, he overheard persons leaving the clubhouse laughing and saying such things as "He wasn't that small!" and "I've seen white guys smaller than that."  *Id.*  Although Plaintiff had not seen what occurred inside the clubhouse, *id.* ("Before I could get a good look inside, I was blocked . . . ."), Plaintiff thereupon "*considered the possibility that* someone had obtained photos or videos of me and intercut them with obscene footage or photos," and summoned VCSD, which found Plaintiff's speculation about his having been sexually lampooned to be unfounded.  *Id.* (emphasis added); Barnes Ex. E (Niebergall Decl.).  Plaintiff presents no admissible evidence that the "possibility" that he "considered," namely the screening of a sexually mocking video about him, actually occurred.

Plaintiff complained about the foregoing Camarillo incidents, among others, to various authorities, including golf course management, the homeowners' association in which he believed his harassers resided, and VCSD.  *See* Pl.'s Decl. ¶¶ 17, 22, 30.  He never received a response he considered satisfactory; on the contrary, his complaints at times resulted in *his* being viewed as the primary troublemaker.  Indeed, on February 11, 2004, VCSD Deputy J. Mulrooney distributed a "wanted"-poster-style Information Bulletin about Plaintiff for internal law enforcement use only. Pl.'s Ex. 12.  The bulletin, of which Plaintiff remained unaware until early in 2007, *id.* ¶ 35, included a photograph of Plaintiff along with his address and vital statistics, and advised in part as follows:

> Over the last year Kagy has reported numerous times that someone has come into his yard at night, thrown things at his windows to keep him awake, and that it is all being done by males between 16 and 22 years of age. He alleged the DPs live on Golf Villa Way in "The Fairways," which is across the golf

course from his residence. I have confirmed that no one of the age he has described lives in that community.

Additionally, Kagy's behavior has included alleging people watching him in his home with heat sensing devices, and listening to him with directional microphones, hacking into his computer system, and most recently that the DPs were in his home at 0400 hours looking for a pad that had his computer passwords on it. There were no signs of an intruder.

Recently, Kagy has started prowling around his neighborhood at night. . . .

Sterling Hills Golf Course has a trespass letter on file, which was primarily generated because of Kagy's behavior. The Sterling Hills Golf Course wants prosecution of anyone caught on the course after hours. On 2/9/2004, I advised (for the second time) Kagy that if he is caught on the golf course at night, he will be arrested for trespassing. Per the DA's office, if he is detained on the course after hours, Kagy is subject to arrest for 602(O) PC. Booking is preferred for offense likely to continue (853.6(i)(7) PC). The advisement is good for 30 days from 2/9/2004. Contact Mulrooney at [phone number] if Kagy is arrested.

**Due to continued calls for service and bizarre behavior, we are requesting that incident reports be taken for all calls for service regarding Kagy.**

Pl.'s Ex. 12 (emphasis in original). A week later, on February 18, 2004, VCSD employee Jennifer Borden, assigned to the department's Crisis Intervention Team (CIT), opened a handwritten dossier on Plaintiff. (The aforementioned hearing, at which Plaintiff's neighbor

unsuccessfully sought an extended protective order against him, also occurred on February 18.) *See* Pl.'s Ex. 15.

Plaintiff and his family moved to Moorpark in May 2004, having been notified in the prior month by the owner of their Camarillo home that it was to be sold. Pl.'s Decl. ¶ 47. (Like Camarillo, police services in Moorpark were provided by VCSD.) After the move, Plaintiff continued to perceive that he was being harassed, although VCSD officials continued to disbelieve his reports and to add to the Department's growing set of records about him.  For example, Plaintiff believed that the microwave beam attacks not only continued, notwithstanding his relocation, but also accelerated and occurred between 20 and 30 times, *see* SGIB ¶ 10, although deputies answering his summonses found his complaints of such attacks unsubstantiated.  *See* SGIB ¶ 12.  On one occasion, a VCSD deputy found Plaintiff standing in his street late at night, wearing dark clothing and holding a radio frequency detector.  Barnes Ex. G (Torres Decl.) ¶ 5.  Aware that police doubted his claims about microwave EMP harassment, Plaintiff contacted VCSD to complain, instead, that a neighbor was shooting small projectiles sounding like "airsoft pellets" at his house.  *See* Barnes Ex. A (Pl.'s Depo.) at internal pp. 102 ("I was very careful by now to not start off by talking about something they were immediately going to be skeptical of. . . . [A]nd so that's why I mentioned the airsoft gun," which, "was an annoyance," although "we were more concerned about the microwaves, yes," than about the airsoft pellets), 103-04. As discussed below, however, when Plaintiff presented his projectile-related suspicions to deputies, they again did not believe him.

Frustrated with VCSD's disbelief and inaction, Plaintiff sought out the FBI. On January 20, 2005, he spoke by telephone with defendant Linda Dozer, a Special Agent for the FBI stationed in Ventura County.  SGIB ¶ 13.  During that call, Plaintiff described the harassment in which he believed neighbors were engaging (including his belief that the harassers were targeting Plaintiff and his family because they were Asian, which might justify federal involvement), but Dozer responded that, in her view, "there was insufficient

evidence to initiate a civil rights investigation." Dozer Decl. ¶ 2; *see* Pl.'s Ex. 42 (Dozer Depo.) at internal p. 24.  Dozer testifies that Plaintiff replied as follows:

> I have tried to have my complaints dealt with by law enforcement and in the proper manner[;] however, if law enforcement is unable to help me[,] then I will be forced to become proactive[.]  I will buy a shotgun and kill them.

Dozer Decl. ¶ 2.

Plaintiff purports to dispute this, but the evidence he cites – including even his own declaration, signed over three months after Dozer's deposition and nearly five and a half months after she signed her own declaration – simply does not conflict meaningfully with Dozer's account.  *See* SGIB ¶ 14, *citing* Pl.'s Ex. 42 (Dozer Depo.) at 24:15-18 ("And you [Plaintiff, who was conducting Dozer's deposition] had made a comment to me that you would have to handle things yourself and something about a shotgun, and you would take care of it."); Pl.'s Ex. 60 (Hutton Depo.) at 25:5-13 (indicating Dozer reported to VCSD Deputy Hutton that Plaintiff had indicated that, "if need be," Plaintiff was "going to purchase a shotgun" "to protect [his] family"); Ex. 65 (Borden Depo.) at 23:12 - 24:7 (testimony about Dozer's call to Borden on January 20, but indicating nothing at all about shotgun-related statements); Pl.'s Decl. ¶¶ 51 (Plaintiff's first efforts to contact FBI in November 2004), 56 (short description of January 20 phone call with Dozer, but not conflicting with above account).[2]

---

[2] Plaintiff also cites the "fourth line from bottom" in Exhibit 13, at Bates-numbered page 01793. But that part of CIT coordinator Jennifer Borden's dossier does not purport to record what Plaintiff said over the phone to Dozer on January 20, 2005 and is thus useless to refute Dozer's testimony about that telephonic statement. Rather, Borden's notes at that line purport to record what Plaintiff said *later on December 20*, in person, to VCSD deputies who visited Plaintiff's home. In any event, the two statements attributed to Plaintiff were quite similar in substance. In both, he allegedly indicated that he may buy and use a shotgun to defend his family, if law enforcement officials did not take stronger steps.

Before the call ended, Dozer scheduled a meeting with Plaintiff for the following morning in her office.  Pl.'s Decl. ¶ 56; *see* Dozer Decl. ¶ 2.

Shortly after the call, Dozer contacted VCSD Deputy William Hutton and reported her account of the shotgun-related comments, prompting Hutton and two other deputies to visit Plaintiff at his home shortly afterwards.  *See* Barnes Ex. F (Hutton Decl.) ¶ 9.  During Hutton's visit, Plaintiff denied any intent to pursue any specific person with a shotgun, although he reiterated his complaints about being zapped with microwave beams.  Hutton saw no visible injuries on Plaintiff or anything else "to substantiate [Plaintiff]'s complaint of an attack with a magnetron."  *Id.*  ¶¶ 10, 12.  Plaintiff had installed metal sheeting against the interior of his windows, explaining to Hutton that the metal blocked the microwave attacks.  *Id.*  ¶ 11.  Plaintiff also told Hutton about the suspected "airsoft" projectiles, showing them a small collection of dried berries and seeds that he contended could have been used as such projectiles.  Hutton did not believe Plaintiff, explaining that it was impossible to shoot such items from an airsoft (or similar) gun.  *See* Pl.'s Decl. ¶ 57; Hutton Decl. ¶ 14.   Although Hutton had contemplated placing Plaintiff under "5150" detention after hearing Dozer's report, his visit with Plaintiff left Hutton unpersuaded that such detention was warranted, at least at that time.  *See* Pl.'s Ex. 60 (Hutton Depo.) at internal pp. 27-29.  Although Hutton implicitly believed Plaintiff to be mentally disturbed, he testified later that Plaintiff did not appear to meet the other criterion of section 5150,[3] in that Plaintiff's composed demeanor, organized household, and failure to name any specific

---

[3]  The section provides as follows:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility, designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody . . . .

1   would-be shotgun quarry reassured Hutton that Plaintiff did not then pose a danger and was

2   not "gravely disabled."[4]  *Id.*

3        Plaintiff arrived the next morning at agent Dozer's office as scheduled,

4   accompanied by his wife, Shi Kagy.  Another FBI Special Agent, Derrell Craig, sat in on

5   the meeting.  Dozer displayed skepticism as to whether the FBI would pursue Plaintiff's

6   complaints and questioned Plaintiff about his shotgun-related comments.  Although the

7   details of what Plaintiff said about a shotgun at this meeting are disputed, it is undisputed

8   that Plaintiff stated that *he might buy a shotgun and use it against* (if not fire it at) *his*

9   *harassers*, inasmuch as the FBI appeared no more willing to believe and help Plaintiff than

10  did the VCSD.  *See, e.g.,* Barnes Ex. A (Pl.'s Depo.) at A71-75; Pl.'s Decl. ¶¶ 59-60.  At

11  his deposition, Plaintiff testified that he had replied as follows to what he characterizes as

12  Dozer's repeated, pestering hypothetical questions:

14       Q:    Did you ever tell her or imply that you would shoot

15             someone that came on your property?

16       A:    Of course.  Yes.  And I told her that I would fire a

17             warning shot, not that I would shoot that person.  But I –

18             and I also told her that I might even shoot to injure if they

19             persist[ed] in coming with a weapon.  I would first fire a

20             warning shot.

22  Barnes Ex. A (Pl.'s Depo.) at A75; *see also* Shi Kagy Decl. ¶ 4 (quoting Plaintiff as having

23  told Dozer, "Maybe I should get a shotgun, maybe it will scare them away").  Plaintiff also

24  identified three neighbors whom he suspected of perpetrating the harassment.  Dozer Decl.

25  ¶ 4; *see* Craig Decl. ¶ 2; Pl.'s Decl. ¶ 58 ("I identified three" neighbors' houses in response

26  to Dozer's question about the sources of the EMP).  Promptly after this meeting, Dozer,

27

28       [4] "Gravely disabled" means "unable to provide for his or her basic personal needs for food,
    clothing or shelter."  CAL. WELF. & INST. CODE § 5008(h)(1)(A).

concerned about Plaintiff's beliefs and statements, and believing him to be an appropriate candidate for 5150 detention, reported about the meeting as follows to VCSD Captain Richard A. Diaz, as memorialized in her files. (Although Plaintiff disputes parts of the substance of Dozer's report to Diaz, the fact that Dozer *made substantially this report* is undisputed.)

> Kagy again expressed his concerns about being "zapped" by microwaves. After [we talked] to Kagy for approximately one hour, he was told that the FBI needed evidence of his allegations in order to investigate. Kagy again stated, "I have to protect myself and my family." Kagy was then repeatedly advised that if he used a gun to harm someone or if he pointed a gun at someone he would be arrested because his actions would be against the law. He then repeatedly stated that he would be defending himself and his family. He added that he would not shoot anyone or shoot at anyone who was not on his property. When asked if he would shoot at someone who was not on his property but nevertheless "zapping" him, he stated that he considered that to be entry [onto] his property[,] and [that] he could defend himself. Kagy stated, "I wouldn't shoot to kill. I'd fire a warning shot or point my gun at them and call the police in order to obtain their microwave device as evidence."

Ex. A to Dozer Decl.

Captain Diaz passed on the substance of Dozer's report to Deputy Robert Barnes, instructing the deputy to visit Plaintiff at his residence to evaluate him again for a possible section 5150 hold. Barnes Exs. L (Diaz Decl.) ¶¶ 7-8 & M (Barnes Decl.) ¶¶ 3,

6.  Barnes spoke with other VCSD deputies about Plaintiff prior to Barnes's arrival at Plaintiff's home.  One of those two deputies, Eugene Torres, passed along information from CIT coordinator Jennifer Borden about numerous encounters between Plaintiff and VCSD, reflecting Plaintiff's belief that neighbors at his current and prior homes were harassing him with microwave energy attacks and other vexations.  Barnes Ex. G (Torres Decl.) ¶ 7; *see also* Barnes Ex. M (Barnes Decl.) ¶ 7.  Barnes, accompanied by Torres and a third deputy, Stoyko, spoke to Plaintiff in person at Plaintiff's home.  In response to Barnes's questions, Plaintiff confirmed that he had visited the FBI office that day, had mentioned getting a shotgun, and believed himself the victim of ongoing microwave energy attacks.  *Id.* ¶ 10; Pl.'s Decl. ¶ 61.  Barnes also observed metal sheeting installed against some of the windows and sides of Plaintiff's house.  Barnes Ex. M (Barnes Decl.) ¶ 9.  Barnes then took Plaintiff into custody pursuant to CAL. WELF. & INST. CODE § 5150, confiscated his pistol and transported him to the nearby Hillmont Psychiatric Center, where Plaintiff would remain until January 27.  SGIB ¶ 1.  The decision to take Plaintiff into custody was solely that of the VCSD, not Dozer or the FBI.  Diaz Decl. ¶ 7.

Barnes provided *Tarasoff* warnings[5] to the three neighbors whom Plaintiff had suspected of being the source of harassment.  Barnes Exs. M (Barnes Decl.) ¶ 13 & T-1.  (Because Plaintiff contends that insufficient grounds existed for detaining him in the first place, he asserts that giving such information was defamatory and an invasion of his privacy.)

Psychiatrist Rocio Agusto, M.D. admitted Plaintiff to Hillmont pursuant to section 5150 based on the following background, similar to that upon which Deputy Barnes had acted, as she states in her declaration:

On the evening of January 21, 2005, I received a telephone

call from Hillmont . . . . I spoke with the psychiatric technician

---

[5]   *See Tarasoff v. Regents of Univ. of California*, 33 Cal. App. 3d 275, 108 Cal. Rptr. 878 (1973).

Kim Urango and the nursing supervisor on duty that evening. I was informed that Mr. Kagy had been brought in by VCSD Deputy Barnes on a § 5150 hold as a danger to others. I was informed that Mr. Kagy had numerous prior police contacts. I was told Mr. Kagy had contacted the FBI, claiming to have been harassed by his neighbors and that if he did not get help from law enforcement, he would buy a shotgun and shoot the neighbors that were harassing him. I was told that the Sheriff's deputy confiscated Plaintiff's gun. Based on this information, I gave a verbal order to admit Mr. Kagy to Hillmont [because] it was my professional opinion that Mr. Kagy met the criteria . . . under § 5150 as a danger to others. I felt that I needed to admit Mr. Kagy to the hospital to rule out an organic cause for his delusions, and because of the reports that he had told an FBI agent that he would get a shotgun and harm his neighbors. At that point, it was my professional opinion that Mr. Kagy suffered from either a delusional disorder or psychosis NOS [not otherwise specified] and that, as a result of his mental illness, he presented a danger to his neighbors.

Barnes Ex. U (Agusto Decl.) ¶ 5. Agusto engaged in a fuller evaluation of Plaintiff on the following two days (January 22 and 23, 2005), continuing to find him paranoid with distorted perceptions and refusing offered medication. *Id.* ¶¶ 6-7.

Defendant and fellow psychiatrist Charles Thomas, M.D. was the acting medical director at Hillmont. (The parties dispute whether Thomas or Agusto was Plaintiff's "attending physician," with Plaintiff insisting Thomas played a more active role than Defendants allow in their motions, but both doctors had access to very similar information about Plaintiff, and the label thus is not material here.) On January 24, 2005,

1  Thomas co-signed a History And Physical report about Plaintiff prepared a day earlier by
2  a medical assistant.  SGIB ¶ 33.  Thomas approved an X-ray and CT scan for Plaintiff as
3  recommended by Dr. Agusto as means of ruling out organic causes of what Agusto
4  believed were Plaintiff's delusions.  *Id.*  (These tests indeed ruled out apparent organic
5  problems.  Pl.'s Ex. 70.)

6  Also on January 24, 2005, another psychiatrist working at the mental health
7  facility, Katherine Hamela, M.D., signed a form indicating her view that Plaintiff remained
8  a danger to others due to mental illness.  In doing so, Hamela invoked CAL. WELF. & INST.
9  CODE § 5250, extending Plaintiff's involuntary detention for up to 14 additional days.
10  (Plaintiff asserts that Thomas, not Hamela, should be viewed as his treating physician for
11  purposes of the section 5250 extension.  Both psychiatrists had access to sufficiently
12  similar information about Plaintiff so as to render the distinction immaterial here.  In any
13  event, Plaintiff does not dispute that Hamela signed the form in question.)  *See* Barnes
14  Ex. V-1 (form).

15  Agusto discharged Plaintiff from Hillmont on January 27, 2005.  "At that
16  time," she believed Plaintiff "no longer posed a danger to others in the community" and had
17  agreed not to harm anyone.  Barnes Ex. U ¶ 9.

18  Months later, Thomas testified at a May 2005 state-court hearing relating to
19  Plaintiff's right to have his pistol returned to him.  Among other things, Thomas testified
20  that, based on his review of numerous documents reflecting Plaintiff's interactions with
21  VCSD and his medical condition during his (Plaintiff's) January custody, he (Thomas)
22  believed Plaintiff suffered from a mental illness, namely paranoid schizophrenia, with poor
23  prognosis if left untreated, *see* Pl.'s Ex. 23 (transcript) at internal pp. 10-11, and presented
24  a danger to others, albeit not an imminent one.  *See id.* at pp. 16-17.  After the hearing, the
25  court ordered Plaintiff's gun forfeited to VCSD.

26  ///
27  ///
28  ///

# IV.

# DEFENDANTS ENJOY QUALIFIED
# IMMUNITY FROM THE SECTION 1983 CLAIM

The County Defendants assert that they enjoy qualified immunity on claim 1 because a reasonable official, possessing the information that Deputy Barnes and Dr. Thomas possessed at the pertinent times, could have believed that probable cause existed for detaining Plaintiff under state law.  The undersigned agrees.

## A.   Probable Cause Standard For Involuntary Psychiatric Detention

The legal threshold for a permissible detention under the section 5150 is as follows:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility, designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody . . . .

CAL. WELF. & INST. CODE § 5150.  Thus, the statute states, as a requirement of California law, that a person taking someone into custody must have probable cause to believe that the detainee suffers from a mental disorder and, as a consequence of that disorder, presents a danger to himself or others, or is gravely disabled.  Moreover, even if the statute did not impose a probable cause requirement, the federal Constitution still would require it:  a seizure of the person implicates the Fourth Amendment, which also requires probable cause.  *See Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1992).  This means that if

probable cause *did* exist for the moving Defendants to detain Plaintiff, then no Fourth Amendment violation occurred.

"Probable cause" under the state law whereby Plaintiff was detained jibes closely with the meaning of "probable cause" under the federal Constitution. "To constitute probable cause to detain a person pursuant to section 5150," the California courts have explained,

> a state of facts must be known to the peace officer (or other authorized person) that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled. In justifying a particular intrusion, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion.

*People v. Triplett*, 144 Cal. App. 3d 283, 287-88, 192 Cal. Rptr. 537, 540-41 (1983). Similarly, "probable cause" under the Fourth Amendment exists "where the facts and circumstances within [the detaining persons'] knowledge and of which they have reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed" – or, in the current involuntary-commitment context, that the person detained meets the standards for such detention under section 5150. *See Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *Maag, supra*, 960 F.2d at 775 ("probable cause" as required for psychiatric detention is analogous to that required under Fourth Amendment for criminal arrest).

As a general rule, probable cause may be supported by hearsay statements, provided that the source of the hearsay bears some indicia of reliability. *Cf. United States*

1    *v. Angulo-Lopez*, 791 F.2d 1394, 1396-97 (9th Cir. 1986).  "An informant's veracity or

2    trustworthiness may be established in a number of ways," the Ninth Circuit panel noted in

3    *Angulo-Lopez*, and –

> [c]ertain classes of informants are considered more reliable than others.  For example, police officers are presumed reliable. [Citations omitted.]  Citizen informants, while not carrying the same presumption of reliability as police officers, [citation omitted], nevertheless require less evidence to establish their veracity than criminal informants. [Citations omitted.]  A citizen informant's veracity may be established by the absence of an apparent motive to falsify and independent police corroboration of the details provided by the informant.

15   *Id.* at 1397.

### B.    Qualified Immunity

18         Mindful of higher tribunals' counsel that "qualified immunity questions should

19   be resolved at the earliest possible stage of a litigation," *see Anderson v. Creighton*, 483

20   U.S. 635, 646 n.6 (1987) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S. Ct. 2727,

21   73 L. Ed. 2d 396 (1982)); *accord, Cunningham v. City of Wenatchee*, 345 F.3d 802, 808

22   (9th Cir. 2003), the Court turns to the County Defendants' assertion that they enjoy

23   qualified immunity.  The Court thereby reviews not whether the undisputed evidence

24   (coupled with Plaintiff's version of facts that are disputed based on sound evidence)

25   establishes probable cause *per se*, but rather whether a reasonable official in Deputy

26   Barnes's and Dr. Thomas's positions *could have believed, even if perhaps mistakenly*, that

27   probable cause existed for detaining Plaintiff under section 5150 (and, to the extent Plaintiff

28   seeks to blame Dr. Thomas for the extension of detention, under section 5250 as well).

1.    **Applicable law**

Government officials are entitled to immunity if "their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow, supra*, 457 U.S. at 818; *Cunningham, supra*, 345 F.3d at 810. The immunity thus shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). The first of two analytical steps for the Court is to ask, "do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If no constitutional violation is shown, the immunity applies, and the Court's inquiry ends then and there. *See id*. If, however, the well-pleaded facts in the complaint show the violation of a constitutional right, then the Court must ask the second question, namely "whether the right is clearly established." *Id*. A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*, 533 U.S. at 202.

2.    **Analysis**

Here, the undersigned assumes, for the sake of discussion only, that a triable factual issue may exist as to the first *Saucier* question and thus advances to the second, "reasonable officer" question, which involves two County-affiliated individuals, namely Deputy Barnes and Dr. Thomas. (The Court further assumes, solely for the sake of discussion, that Dr. Thomas was Plaintiff's "attending physician" at Hillmont and that his (Thomas's) actions fairly can be attributed to the County.) Could each man, having the information that he had, reasonably have believed that it was legal to subject Plaintiff to psychiatric detention?

The answer is yes. Both men were aware of several reports by other law-enforcement personnel (1) that, even if inaccurate or incomplete or both (as Plaintiff strenuously insists), facially support a reasonable inference that Plaintiff suffered from a mental illness and presented a danger to others, and (2) upon which it was reasonable for

1 them to rely.  This determination does not require the Court to acquire or marshal any
2 esoteric expertise in electromagnetic fields and their potential use as a weapon from a
3 distance, in the manner Plaintiff firmly believes occurred in the months and years preceding
4 his detention.  Rather, the Court's ruling is much more limited.  As a matter of law, a
5 reasonable deputy or psychiatrist in Barnes's or Thomas's position, having been made
6 aware of, among other things, (a) Plaintiff's numerous complaints about microwave-beam
7 attacks and other vexations in recent years; (b) the fact that investigating VCDS officers
8 found the complaints to be unsubstantiated; and (c) his recent comments about a shotgun,
9 all *as reflected in VCSD files* (often as summarized, second hand, by intermediaries),
10 reasonably could have believed that Plaintiff suffered from a mental illness, and that he
11 presented a danger to others as a result of that mental illness.  As to the 5250 hold:
12 Plaintiff's unswerving belief, after three days of detention, in what Thomas believed were
13 delusions about EMP and other attacks, could lead a reasonable person in Thomas's
14 position to conclude that Plaintiff remained dangerous to others due to a mental illness.
15 Even if mistaken, none of the challenged decisions to detain Plaintiff was "plainly
16 incompetent or" a "knowing[] violat[ion] [of] the law."  *See Malley v. Briggs*, 475 U.S.
17 335, 341 (1986).

18        In sum, whether or not probable cause in fact existed for detaining Plaintiff
19 under section 5150 and for continuing his detention under section 5250, the undersigned
20 concludes that a reasonable official in Deputy Barnes's or Dr. Thomas's shoes could have
21 believed it existed.  Accordingly, no factual dispute exists to be tried on Plaintiff's § 1983
22 claim against the County Defendants, who enjoy qualified immunity.  Those Defendants
23 thus are entitled to summary judgment as to that claim.  (The only County defendant other
24 than Thomas and Barnes is the County itself, but the County enjoys the same immunity that
25 its officials do.)  Based on this determination, the undersigned does not decide the question
26 of probable cause *per se.*  Nor need the Court determine numerous other questions, such
27 as whether Dr. Thomas's actions properly are attributable to the County (although the
28 undersigned has assumed they are, solely for purposes of deciding the pending motions).

# V.

## DR. THOMAS ENJOYS IMMUNITY FOR HIS
## TESTIMONY AT THE MAY 2005 GUN-RELATED HEARING

"Witnesses, including police witnesses, are accorded absolute immunity from [civil] liability for their testimony in judicial proceedings." *Paine v. City of Lompoc*, 265 F.3d 975, 980 (9th Cir. 2001); *see id.* at 981 (absolute immunity applies even if witness committed perjury or joined in conspiracy to commit perjury). Plaintiff appears to base his section 1983 claim against Dr. Thomas partially on the psychiatrist's testimony at the May 2005 state-court hearing relating to Plaintiff's right to possess a firearm for five years. (Plaintiff also may base some of his *state tort* claims on the same actions, but, as discussed in section VII below, the undersigned recommends dismissing the state tort claims without prejudice and without discussing their merits.)  Dr. Thomas enjoys absolute testimonial immunity from any such claim or partial claim.

# VI.

## THE FEDERAL DEFENDANTS
## DID NOT "SEIZE" PLAINTIFF OR HIS GUN

The Federal Defendants – namely FBI agent Dozer and, solely through Dozer, the FBI – cannot be liable on Plaintiff's section 1983 claim, which asserts an unreasonable seizure, for the simple reason that they did not seize Plaintiff or his gun.  The undisputed evidence shows only communications between Dozer and County officials, not commands issued by a superior to a subordinate or any other scenario in which a reasonable fact-finder could conclude that Dozer – instead of, or in conjunction with, County officials – *decided* to seize Plaintiff or in fact *seized* him.  It is true that the same evidence indicates that Dozer strongly believed Plaintiff should be committed and hoped that the County, with Dozer's informational input and urging, indeed would commit him.  But such is true of any witness who reports to police what she believes is a crime or other state of affairs meriting immediate police attention:  the complaining witness usually wants the alleged criminal

arrested.  In neither case, however, is the witness properly viewed as the one who performs (or orders) the actual detaining.  Accordingly, the Court should grant the portion of the Federal Defendants' motion relating to the section 1983 claim.

## VII.

## SECTION 5150 IS NOT UNCONSTITUTIONAL

In the second of his two federal claims, Plaintiff seeks a judicial declaration that sections 5150 *et seq.* are unconstitutional – at least "as applied" and possibly facially as well – because they are vague and overbroad, and permit the State to deprive a person of liberty without due process, in violation of the Constitution.  Plaintiff cites neither any decision holding this statute (or any similar statute in another state) unconstitutional for that reason nor any persuasive reason for this Court to be the first to do so.  As District Judge Marilyn Hall Patel of the Northern District of California noted recently, "Plaintiff's argument [that section 5150 is unconstitutional] is undeveloped and specious[.]  Section 5150 is simply a codification of particular circumstances falling into well-established exceptions to the Fourth Amendment's warrant requirement. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed.2d 290 (1978) ('Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.')." *Duarte v. Begrin*, No. C 05-05223 MHP, 2007 WL 705053, at *5 (N.D. Cal. 2007).

## VIII.

## THE COURT SHOULD DISMISS

## THE STATE TORT CLAIMS WITHOUT PREJUDICE

If the Court agrees with the foregoing portions of this Report, all that will remain of this action are Plaintiff's several pendent state tort claims.  All Defendants assert, first, that the Court should dismiss those claims for lack for jurisdiction, and alternatively

that the claims fail on their merits due to state-law-based immunity. The Court opts for the first approach. Denying those claims on the merits would require the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) even though, because no federal claims remain, the Court has the discretion to dismiss the "orphaned" state law claims. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial," the Supreme Court has advised, "the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988); *see also Acri v. Varian Associates, Inc.*, 114 F.3d 999 (9th Cir. 1997) (*en banc*) (quoting *Carnegie-Mellon*). Plaintiff "does not argue that [his] case is in any way unusual" in the sense contemplated by *Carnegie-Mellon. Gini v. Las Vegas Metro. Police Dept.*, 40 F.3d 104, 1045 (9th Cir. 1994). The Court thus recommends the exercise of discretion to decline jurisdiction over the state tort claims.

## IX.

## RECOMMENDATION

For the reasons set out above, IT IS RECOMMENDED THAT the Court GRANT IN PART Defendants' motions for summary judgment, as discussed herein, and enter Judgment dismissing this action (a) with prejudice as to Plaintiff's federal claims but (b) without prejudice to Plaintiff's state-law claims.

DATED: ~~August~~ September 3, 2007

RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE